# In the United States Court of Federal Claims

No. 10-261 V
(Filed Under Seal: March 11, 2014)[1]
Released for Publication: March 27, 2014

**************************************
\*
**JEFFREY TOMPKINS, as personal** \*
**representative of the Estate of** \*
**William Bruce Tompkins, deceased,** * Vaccine Act, 42 U.S.C. §§ 300aa-1 *et seq.*;
             Petitioner, * Review of Special Master's Decision;
\* Off-Table Injury; Guillain-Barré
           v. * Syndrome
\*
**THE UNITED STATES,** \*
\*
           Respondent. \*
\*
**************************************

*Murray Henner*, Scottsdale, AZ, for Petitioner.

*Lisa Ann Watts*, Vaccine/Torts Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

## ORDER AND OPINION

**Damich**, Judge:

      On July 22, 2013, Petitioner filed, on behalf of his son, William Bruce Tompkins ("William"), a petition for review of the Chief Special Master's Decision denying compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1 to -34 (2006 & Supp. V 2011), ("Vaccine Act"). Petitioner had alleged that two sets of vaccines administered to William on July 23, 2008 and August 22, 2008, caused William's Guillain-Barré syndrome ("GBS"). On June 21, 2013, Chief Special Master

---

[1] Vaccine Rule 18(b), contained in Appendix B of the Rules of the United States Court of Federal claims ("RCFC"), affords each party fourteen days to object to the disclosure of (1) trade secrets or commercial or financial information that is privileged or confidential or (2) medical information that would constitute "a clearly unwarranted invasion of privacy."

Denise K. Vowell[2] denied compensation on the grounds that Petitioner did not establish by preponderant evidence that the vaccines caused William's GBS.

In his motion for review, Petitioner requests this court to enter judgment in his favor, arguing that the Chief Special Master improperly weighed the evidence and misapplied the relevant legal standards. For the reasons set forth below, the Court finds that the Chief Special Master's factual findings are supported by substantial evidence and that she correctly applied the relevant legal standards. Petitioner's motion for review is therefore denied.

**I.  Background**

On July 21, 2008, William, age 19 and in good health, entered the United States Marine Corps.[3] On that same date, he reported to boot camp. Two days later, on July 23, 2008, he received his first set of routinely administered vaccinations. The vaccinations included: measles; mumps; rubella ("MMR"); hepatitis A -B Twinrix; pneumococcal; and meningococcal vaccines.

While still at boot camp, William reported to sick call on August 9, 2008, complaining of a sore throat, fever, chills, night sweats, headache, earache, and neck stiffness. He was diagnosed with an upper respiratory infection, and was given non-prescription medications and told to return to training.

Despite William's return to training, he sought treatment again on August 15, 2008, complaining of a sore throat and a very painful headache (scoring it 8 out of 10 on a pain scale). While he no longer suffered from sweats, fever, chills, and neck stiffness, he was coughing up sputum and had an inflamed throat. This medical evaluation revealed that William again displayed symptoms of an upper respiratory infection together with sinus congestion, sore throat, and a sinus headache. At this visit, William was prescribed ibuprofen, Mucinex, Claritin-D, and Nasonex. William was designated with a "sick in quarters" status for 24 hours and a subsequent 48 hours of light duty, and was instructed to return the next morning to be re-evaluated. There is no record that William returned to the clinic for his follow-up appointment, as he was advised.

A second set of routine vaccinations was administered to William on August 22, 2008. These included: a second dose of Twinrix; polio; a combined tetanus, diphtheria, and acellular pertussis ["Tdap"]; varicella; and yellow fever vaccines.

---

[2]  Subsequent to the filing of the decision, September of 2013, Special Master Vowell was designated Chief Special Master for the Office of Special Masters. Accordingly, she will be referred to as Chief Special Master.

[3]  The Court derives the undisputed medical history and procedural history from the Chief Special Master's Decision. *See generally, Tompkins v. Sec'y of HHS*, No. 261 V, 2013 WL 3498652 at *2-10 (Fed. Cl. Spec. Mstr. June 21, 2013) ("Dec. __ " hereinafter.)

Six days later, on August 28, 2008, William went to a primary care clinic, complaining of numbness and tingling in his fingers and toes.  William reported that the sensation had begun approximately two days earlier, on August 26, 2008.  He further reported that he was very weak, and that the weakness made it difficult for him to dress and walk.  Although he complained of mild shortness of breath, he no longer suffered from chest congestion, coughing, fever, chills, or night sweats.  There was also no inflammation in his throat, unlike his August 15, 2008 examination.  He informed the medical professional who examined him that prior to August 26, he had been feeling well.

The August 28 examination also revealed substantial muscle weakness in William's arms, hands, shoulders, and legs.  William's symptoms lead him to be transferred to the Medical Intensive Care Unit at Naval Medical Center San Diego.  He was admitted under a probable diagnosis of GBS-Acute Inflammatory Demyelinating Polyneuropathy ("AIDP").  While in intensive care, William received intravenous immunoglobulin treatment, and his condition generally improved.  After his fifth day in intensive care, William's condition had improved enough that he was moved into the general Medical Center ward population, until his transfer to Continental Rehabilitation Hospital, a rehabilitation facility, on September 4, 2008.  William was discharged from the rehabilitation hospital after a thirty-day stay.  At the time of discharge, he was able to jog, walk with a pack, and ride a bicycle, even as these activities made him extremely fatigued.

On October 6, 2008, William returned to the local military base hospital where he underwent a medical workup for the Physical Evaluation Board ("PEB").  The evaluation revealed that William was continuing to recover, but the evaluation also found that William remained mildly weak, preventing him from returning to training.  As a result, the PEB recommend referral to a formal PEB.

Following the medical workup, on November 20, 2008, the formal PEB found William unfit for military service based on mild residual deficits from GBS, and placed him on the Temporary Disability Retired List, with a 30% disability rating.  He was awarded $243.00 per month in compensation for this service-related disability from the Department of Veteran Affairs in March 2009.

### B.  Procedural History

William filed a petition for compensation under the Vaccine Act on April 28, 2010, claiming that the vaccines he received on July 23, 2008 and August 22, 2008, caused him to develop GBS.  Accompanying his petition was an expert opinion by Steven Pike, MD.

Initially, this claim proceeded along an early settlement track.  A stipulation of settlement was initially signed by William.  However, before the stipulation of settlement was finalized, William died from fatal injuries sustained from an automobile accident.

William's death, Petitioners concede, was unrelated to his putative vaccine injury. Neither party admitted to a vaccine-related injury during William's life.

After William's death, rather than execute the settlement agreement, Respondent moved to dismiss the case. In opposition to the motion to dismiss, counsel for William sought to substitute William's father, Jeffrey Tompkins ("Mr. Tompkins"), as Petitioner. In an unpublished ruling, Special Master Gary Golkiewicz,[4] denied the motion to dismiss, and granted the motion to substitute Mr. Tompkins as Petitioner on behalf of his late son's estate.[5] Thereafter, the case proceeded as a contested matter.

As this was now a contested matter, Respondent filed its Rule 4(c) Report with a responsive expert opinion by Daniel M. Feinberg, MD. In addition, both experts filed supplemental reports. After the submissions were complete, the Chief Special Master convened an entitlement hearing, during which the Chief Special Master heard the testimony of the two expert witnesses, Dr. Pike and Dr. Feinberg. Post-hearing briefs were waived, and the Chief Special Master filed her decision on June 21, 2013.

In her decision, the Chief Special Master focused on the issue of causation. She noted that both experts agreed that William suffered from GBS. Where the experts disagreed, the Chief Special Master explained, was on the cause of William's GBS. Dr. Pike opined that William's condition could have been caused by all or one of the vaccines he received. Specifically, he asserted that because William was acutely ill with an upper respiratory infection at the time his second set of vaccines was administered, the vaccines' administration caused William's GBS condition. He further attempted to support his causation theory through his own calculations of the relative risk of developing GBS (after receiving the vaccines), based on VAERS reports.[6] Dr. Feinberg, on the other hand, relying on epidemiologic evidence, opined that the most likely cause of William's GBS was his upper respiratory infection.

The Chief Special Master ruled that William was not acutely ill at the time of his second set of vaccinations on August 22, 2008. Because this was a critical factor of the theory of causation advanced by Dr. Pike, she concluded that Petitioner could not establish that Dr. Pike's theory was probable. Although this conclusion, on its own, was sufficient to deny Petitioner's request for compensation under the Vaccine Act, the Chief

---

[4] Special Master Golkiewicz retired from the Office of Special Masters and the case was reassigned to the Chief Special Master, on May 7, 2012.

[5] The Federal Circuit has recognized the right of the estate of a vaccine-injured individual to pursue a claim filed prior to death. *See Figueroa v. Sec'y of HHS*, 715 F.3d 1314 (2013).

[6] VAERS stands for the Vaccine Adverse Event Reporting System. It has been concluded that this reporting system is unreliable as the basis for determining causation. *See, e.g. Analla v. Sec'y of HHS,* 70 Fed. Cl. 552, 558 (2006); *Ryman v. Sec'y of HHS,* 65 Fed. Cl. 35, 39-40 (2005).

Special Master addressed other aspects of Dr. Pike's theories. She found that even if William's antecedent infection alone did constitute sufficient cause, Petitioner's proof never rose to the preponderant evidence standard required for Vaccine Act Off-Table cases. In this case, William received a mix of vaccines – some vaccines that were covered by the Vaccine Act, and some that were not.[7] However, as the Chief Special Master noted, one can receive a vaccine not covered by the Vaccine Act and still have a causation case. Nevertheless, the Chief Special Master found that Petitioner had not carried its burden of proof showing that the administration of Off-Table vaccines caused William's GBS. Additionally, the Chief Special Master found that Dr. Pike's own research and medical literature, including medical journal articles, submitted by Petitioner failed to provide adequate support for his causation opinions.

In her opinion, the Chief Special Master further recognized that William died before the settlement was finalized and the Respondent elected not to exercise her option to execute the stipulation. She also noted that the express terms of the agreement made it voidable by either party upon William's death.

The Chief Special Master held that Petitioner had not met his burden of proving that the two sets of vaccines had caused William's GBS, and, therefore, denied Petitioner's request for compensation. Petitioner, alleging error, timely sought review of the Chief Special Master's Decision.

## II. Legal Standards

Under the Vaccine Act, a court may set aside a Special Master's findings of fact or conclusions of law only if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa-12(e)(2)(B). With respect to findings of fact, the Special Master has broad discretion to weigh expert evidence and make factual determinations. *See Bradley v. Sec'y of HHS*, 991 F.2d 1570, 1575 (Fed. Cir. 1993). The Federal Circuit has clearly indicated its longstanding standard of review when the Court of Federal Claims hears petitions on review from the Special Masters:

> Congress assigned to a group of specialists, the Special Masters within the Court of Federal Claims, the unenviable job of sorting through these painful cases and, based upon their accumulated expertise in the field, judging the merits of the individual claims. The statute makes clear that, on review, the Court of Federal Claims is not to second guess the Special Masters [sic] fact intensive conclusions; the standard of review is uniquely deferential for what is essentially a judicial process. Our cases make clear that, on our review . . . we remain equally deferential. That level of deference is especially apt in a case in which the medical evidence of

---

[7] For a Petitioner to prevail under the Vaccine Act, "a petitioner must prove either a 'Table' injury or that a vaccine listed on the Table was the cause in fact of an injury (and of an 'Off Table' injury)." Dec. 2. GBS is not a Table injury.

causation is in dispute.

*Hodges v. Sec'y of HHS*, 9 F.3d 958, 961 (Fed. Cir. 1993) (internal citations omitted); *see also Snyder v. Sec'y of HHS*, 2014 U.S. App. LEXIS 1674, at *10-11 (Jan. 28, 2014) (quoting *Hodges*).

"If the special master has considered the relevant evidence of the record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of HHS*, 940 F.2d 1518, 1528 (Fed. Cir. 1991). This Court ought not to second-guess the Special Master's fact-intensive conclusions, particularly in cases "in which the medical evidence of causation is in dispute." *Hodges*, 9 F.3d at 961. In such cases, which often involve expert testimony, the Federal Circuit has "unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act." *Porter v. Sec'y of HHS*, 663 F.3d 1242, 1250 (Fed. Cir. 2011). "Such credibility determinations are 'virtually unreviewable'" on appeal. *Id.* at 1251. With respect to questions of law, legal rulings are reviewed *de novo* under the "not in accordance with law" standard. *See*, *e.g.*, *Moberly v. Sec'y of HHS*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Munn v. Sec'y of HHS*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).

**III. Discussion**

When evaluating a motion for review, as stated above, it is the Court's task to determine whether the Special Master, or in this case, the Chief Special Master, properly considered the relevant evidence in the record before her, came to factual conclusion based on plausible inferences, and provided a reasoned explanation for her conclusion and decision. *Hines*, 940 F.2d at 1528. It is not the Court's task to second-guess the Special Master, especially in cases "in which the medical evidence of causation is in dispute." *Hodges*, 9 F.3d at 961. Thus, on review, the Court accords deference to the Special Master's factual findings and fact-based conclusions.

Nevertheless, the majority of Petitioner's memorandum expresses general disagreement with the Chief Special Master's evaluation and weighing of the evidence. Specifically, Petitioner argues three points of error by the Chief Special Master. First, Petitioner alleges that the Chief Special Master applied a "higher scientific and medical standard" than required for the adjudication of his claim. Second, Petitioner contends that the Chief Special Master's factual finding that William was not acutely ill at the time of his second set of vaccinations was arbitrary or capricious. Finally, Petitioner argues that Respondent was legally obligated to endorse the prior stipulation after William's death. In light of the Chief Special Master's detailed and reasoned decision, this Court concludes that none of these arguments provides a basis for this Court to set aside the Chief Special Master's Decision.

### A. The Chief Special Master Stated and Applied the Correct Statutory Standard of Proof and Was Not Clearly Biased in Favor of Respondent's Expert

Petitioner argues that he submitted preponderant evidence that the Table vaccines administered to William caused his GBS because (1) it is unclear as to what causes GBS; (2) there has not been any medical journal or scientific study concluding that no nexus exists between vaccinations and the onset of GBS; (3) the onset of numbness and paralysis within four days after receiving his second set of vaccinations established a temporal "nexus;" and, (4) the theory advanced by Dr. Pike was "probative."[8]  Pet. Br. 2-9.  The thrust of Petitioner's argument is that the Chief Special Master "cloak[ed] the application of an erroneous legal standard in the guise of a credibility determination." *Id.* at 10.  This argument rests on Petitioner's view that the Chief Special Master is unable to assess the reliability of Petitioner's evidence or the credibility of witnesses, including her "mislabel[ing] and discredit[ing]" Petitioner's expert witness by referring to him as "Dr. Steven Pike, MD, JD." *Id.* at 5.

The Court notes that it is the Respondent, not the Chief Special Master, who referred to "Steven Pike, MD, JD" in its prior pleadings.  These pleadings were subsequently stricken by the Court, and as such, this argument is moot.  Furthermore, the Chief Special Master, in her decision, referred to Dr. Pike as "an emergency physician and medical toxicologist." Dec. 14.  She acknowledged his credentials as being board-certified in medical toxicology and occupational and environmental medicine, and, in a footnote, noted that he also holds JD and MBA degrees. *Id.* at 14 n.28. This is hardly discrediting the witness.  Likewise, the mere fact that she did not attach his list of certifications does not rise to the level of mislabeling Dr. Pike's credentials, as Petitioner suggests. Pet. Br. 6.

A good portion of Petitioner's motion for review is his disagreement with the Chief Special Master's determination that Respondent's expert witness, Dr. Feinberg, was more qualified and persuasive than Petitioner's expert witness, Dr. Pike**.**  Indeed, in her decision, the Chief Special Master was clear to articulate Dr. Pike's relative lack of training and experience in neurology.  She further noted that "there is no testimony or other evidence indicating that [Dr. Pike] treats or diagnoses GBS." Dec. 14.  In comparison, the Chief Special Master found respondent's expert, Dr. Feinberg, "a well-qualified neurologist who diagnoses, treats, and teaches about GBS." *Id.*

---

[8] As proof for the proposition that Dr. Pike's theory was "probative," Petitioner cites to or discusses medical and other literature that was never submitted in the case before the Chief Special Master.  Vaccine Rule 8(f) states that "any fact or argument not raised specifically in the record before the special master will be considered waived and cannot be raised by either party in proceedings on review of a special master's decision." RCFC App. B, Vaccine Rule 8(f); *see also Jay v. Sec'y of HHS*, 998 Fed. 979, 983 n.4 (Fed. Cir. 1994) (holding that petitioners had "abandoned" arguments not raised below).  The Court, therefore, will strike these documents from the record.

Petitioner also claims that the Chief Special Master employed a "higher scientific and medical standard of review" than the Vaccine Act permits. Pet. Br. 4. That is not the case. In her decision, the Chief Special Master correctly indicated that Petitioner bore the burden to "produce preponderant evidence that a covered vaccine is responsible for William's injury." Dec. 2; *see Stone v. Sec'y of HHS*, 676 F.3d 1373, 1379 (Fed. Cir. 2012) (citing 42 U.S.C. § 300aa–13(a)(1)(A)). The Chief Special Master concluded that "petitioner failed to produce preponderant evidence of vaccine causation" by applying the following preponderance standard: "'requir[ing] the trier of fact to believe that the existence of a fact is more probable than its nonexistence.'" Dec. 13, 14 (quoting *In re Winship*, 397 U.S. 358, 371 (1970) (Harlan, J., concurring) (internal quotation and citation omitted)). She explained that "petitioners are not required to establish identification and proof of specific biological mechanisms, as 'the purpose of the Vaccine Act's preponderance standard is to allow the finding of causation in a field bereft of complete and direct proof of how vaccines affect the human body.'" *Id.* at 5 (quoting *Althen v. Sec'y of HHS*, 418 F.3d 1274, 1280 (Fed.Cir. 2005)).[9]

In applying this standard, the Chief Special Master noted that she is "not required to accept the *ipse dixit* of any expert's medical or scientific opinion because [she] may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Dec. 6 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Accordingly, "[s]pecial masters decide questions of credibility, plausibility, probability, and reliability, and ultimately determine to which side the balance of the evidence is tipped." Dec. 7 (internal citation omitted).

Despite the Chief Special Master hesitations regarding Dr. Pike's medical background and expertise, she expressed greater unease about his medical theories in general. *Id.* at 13. Although she noted that molecular mimicry was a possible medical theory, she found that Dr. Pike did not demonstrate that it was probable for any of the Table vaccines William received. *Id.*

The Chief Special Master further found that Dr. Pike's "other theories lacked any indicia of reliability." *Id.* While Petitioner accuses the Chief Special Master of animus towards Dr. Pike's theories, she supported her decision with a thorough assessment of the record before her:

> The logical connection between the vaccines and the injury is lacking, based on the timeframes between inciting event and symptoms, the highly tenuous connections between the received vaccines and injury, and the evidence of a far more likely and temporally more appropriate cause. The latter set of vaccinations was administered too close in time to the onset of

---

[9] To establish a legal cause in an off-Table case, petitioners must establish each of the three *Althen* factors by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury. (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a proximate temporal relationship between vaccination and injury. *Althen*, 418 F.3d at 1278.

symptoms to be causal, according to the same IOM Report upon which petitioner relied as evidence for causation.

*Id*. at 13-14.  Furthermore, the Chief Special Master explained that:

Although [Dr. Pike] identified a number of theories of causation, he never specified a particular theory as the most likely causal mechanism in William's case. His discussion of causation theories in his second report is rambling and it is not entirely clear to what extent, if any, he relies upon any of the theories set forth.

*Id*. at 28.

With regard to Dr. Pike's use of "spikes in the VAERS data as evidence of vaccine causation," *id*. at 25, the Chief Special Master acknowledged that Dr. Pike's approach had some merit but, in this, case, she found the execution flawed, *see generally id*. at 25-28.  Specifically, she found the data unreliable and his conclusions suspect. *Id*.  Moreover, she disagreed with the plain logic of Dr. Pike's analysis:

The more fundamental problem is that Dr. Pike was fishing for data in a stocked pond, and then extrapolating from the resulting catch to opine on the fish population of a nearby lake. VAERS is a stocked pond. It only contains reports (many of which are unverified or incomplete) of adverse events after vaccinations. VAERS contains no reports or data about the relative rate of these same events in individuals who have not been vaccinated.

*Id*. at 22.

And lastly, after hearing Dr. Pike's testimony regarding his "combined effects theory," that Williams's two sets of vaccinations combined with his intervening upper respiratory infection caused him to develop GBS, she found that theory unreliable because it was supported by nothing more than his *ipse dixit*. *See generally id*. at 11-15, 20-22, 31-33, 41-44.  The Chief Special Master noted that Dr. Pike did not cite to any references to support this theory.  And she found that Dr. Feinberg's testimony effectively rebutted these assertions. *Id.* at 41-42.

Other than mere disagreement with the Chief Special Master's evaluation of Dr. Pike's opinion, Petitioner offers no substantial evidence indicating that the Chief Special Master's findings were biased.  The Chief Special Master considered all of the record evidence, including that offered by Respondent, in determining whether petitioner had met his burden of proof.  *Id*. at 42.  She concluded that the *Althen* prong two requirement of a logical connection between the vaccines and William's GBS was lacking because the "clear weight of the evidence" supported William's upper respiratory infection (sixteen days prior to GBS onset) as sufficient cause alone.  *Id.*  She also found that with regard to the temporal relationship between the vaccinations and William's onset (*Althen* prong

9

three) under Dr. Pike's own analysis, William's August 22, 2008 vaccinations were "too soon" to attribute causation to the, whereas the interval between William's upper respiratory infection and his GBS was "just right." *Id.* at 45-47.

The arguments advanced do not show that the Chief Special Master applied a heightened burden to his claim. What is clear is that the Chief Special Master thoroughly evaluated the evidence of record, including Dr. Pike's opinions regarding vaccine causation, and found that Petitioner failed to show that the Table vaccine William received more likely than not caused his injury. As this court ought not to second-guess the Special Master's fact-intensive conclusions, particularly in cases "in which the medical evidence of causation is in dispute," *Hodges*, 9 F.3d at 961, the Court will not do so here. The Federal Circuit has "unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act." *Porter*, 663 F.3d at 1250. Therefore, the Chief Special Master's conclusion that Dr. Feinberg was more persuasive than Dr. Pike was not improper.

   B.  **The Chief Special Master's Factual Findings are Based on a Plausible Reading of the Record**

Petitioner contends that the Chief Special Master's determination that William was not suffering from an acute illness at the time of his second round of vaccinations was arbitrary and capricious. Pet. Br. 3. As the Federal Circuit explained in *Hines*, "If the special master has considered the relevant evidence of the record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." 940 F.2d at 1528. Here, the findings were based on a thorough review of the record and logical inferences that this court considers both well-reasoned and rational. Dec. 10-11. Thus, applying the deferential standard of review, the only question for the Court is whether the finding that William was not acutely ill at the time of his second vaccinations on August 22, 2008 is based on a plausible reading of the record. The Court holds that the Chief Special Master's findings were indeed based on a plausible reading of the record.

To begin, the Chief Special Master's decision enunciated several reasons supporting her decision to find that Petitioner was not "acutely ill." For instance, the Chief Special Master concluded that William did not return to the clinic on August 16, 2008, after being directed to do so. Dec. 8. Nor are there any medical records that William was sick between August 16 and August 28, the latter being the day he reported the two-day numbness and tingling in his extremities. *Id.* Additionally, on August 28, at the clinic, the medical report indicated that William had advised that he had "been feeling well" prior to the onset of the tingling, and that he had specifically denied chest congestion, cough, fever, chills and night sweats. The medical records further indicated that William had a history of periodic sinusitis and that his only complaint on August 15 was a headache, indicating that his upper respiratory infection was dissipating at that time. *Id.* at 10-14. These facts led the Chief Special Master to conclude, "William was mostly recovered from his upper respiratory infection, even if he had a painful sinus

10

headache," and that, "his sinus problems were probably not symptomatic of an acute upper respiratory infection." *Id*. at 10.

Contrary to her findings, Petitioner argues that "[i]t is a giant leap of faith for a Special Master to conclude that because there are no records indicating [William] did not return for a reevaluation on August 16, 2008 that he actually did not return." Pet. Br. 16. Petitioner also argues that the Chief Special Master ignored certain documents and evidence in making her findings. These documents were attached to his motion for review. But as the Court has already ruled, these documents are inadmissible.

Petitioner has failed to point to any other evidence in the record to show that the findings were not substantiated by the record. As long as the special master's findings of fact are "based on evidence in the record that [is] not wholly implausible, [this Court is] compelled to uphold that finding as not being arbitrary or capricious." *Cedillo v. Sec'y of HHS*, 617 F.3d 1328, 1338 (Fed. Cir. 2010) (*quoting Lampe v. Sec'y of HHS*, 219 F.3d 1357, 1363 (Fed. Cir. 2000)). The Court, therefore, upholds the Chief Special Master's findings of fact.

### C. The Stipulation of Settlement Was Not Legally Enforceable

Petitioner misconstrues the stipulation of settlement signed by William as a legally enforceable agreement. Pet. Br. 12-15. The stipulation, offered into the record, lacks the signatures of authorized representatives from United States Department of Health and Human Services and United States Department of Justice, as required by RCFC, App. B, Vaccine Rule 11(b). Respondent correctly characterizes the situation in stating that "[n]either this Court nor the special master may force a party to settle a vaccine injury claim." Resp. Br. 19. The Chief Special Master correctly determined that she lacked the legal authority to enforce the stipulation that both parties had failed to finalize. *See* Dec. 3 n.8.

Additionally, as the Chief Special Master noted, William died before the settlement was finalized. *Id*. at 3. The express terms of the agreement made it voidable by either upon William's death. *Id*. at 3 n.8. Therefore, the stipulation of settlement was voidable upon his death, and Respondent chose to void the agreement.

### IV. Conclusion

For the reasons stated above, the court **DENIES** Petitioner's motion for review and **SUSTAINS** the decision of the Chief Special Master. The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Edward J. Damich
EDWARD J. DAMICH
Judge
